UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------------X

UNITED STATES OF AMERICA,


                                    Plaintiff,          **MEMORANDUM & ORDER**
                                                        21-cr-00390 (JMA) (ARL)

              -against-


URIEL WHYTE,


                                    Defendant.
--------------------------------------------------------------------X

**AZRACK, United States District Judge:**

On July 27, 2021, a federal grand jury sitting in Central Islip, New York, returned an indictment charging Defendant Uriel Whyte (hereinafter, "Whyte") with being a felon-in-possession of ammunition on January 26, 2020 in violation of 18 U.S.C. §§ 922(g)(1), 924(a)(2), and 3351 et seq. (Count One), and with being a felon-in-possession of a firearm on April 9, 2020, also in violation of 18 U.S.C. §§ 922(g)(1), 924(a)(2), and 3351 et seq. (Count Two). (See ECF No. 1.) On August 30, 2021, Whyte was arraigned on the two-count indictment. (See ECF No. 9.)

Thereafter, Whyte filed three motions currently pending before the Court. On May 2, 2023, Whyte filed a motion to suppress statements made to law enforcement officers following his arrest on April 9, 2020. (See Def.'s Mem., ECF No. 28.) Whyte contends the statements should be suppressed because they were obtained in violation of the Fourth and Fifth Amendments. (See id.) On October 3, 2023, Whyte filed a second motion to suppress physical evidence—specifically, the black Smith and Wesson 9mm pistol recovered by law enforcement on the day of his arrest. (See Def.'s Mem., ECF No. 40.) Whyte seeks suppression of the physical evidence on Fourth Amendment grounds, arguing that the firearm was seized prior to the issuance of a search warrant. (See id.) Also on October 3, 2023, Whyte filed a motion to dismiss the indictment, arguing that

18 U.S.C. § 922(g)(1) violates the Second Amendment as applied to him, particularly in light of the Supreme Court's recent decision in New York State Rifle & Pistol Association, Inc. v. Bruen, 142 S. Ct. 2111 (2022).  (See id.)

For the following reasons, Whyte's motions are DENIED in their entirety, without need for a hearing.

## I.      BACKGROUND

A.    **Facts**

The following facts are drawn from Whyte's declaration in support of his motion to suppress statements, (ECF Nos. 28, 41), and the Government's memorandum in opposition to that motion, (ECF No. 29).  Any inconsistencies or conflicts between the two are noted.

### 1.      Whyte's Relevant Criminal History[1]

As discussed below, Whyte's criminal history is relevant to his motion to suppress statements (in the context of Miranda warnings) and to his motion to dismiss the indictment (in the context of as-applied challenges to § 922(g)(1)).

Prior to his arrest on April 9, 2020, Whyte had a lengthy criminal history dating back to 2004.  (See Gov't Opp'n at 2–4, ECF No. 29.)  Most relevant to the instant motions is that Whyte has been convicted of five felonies committed in Nassau County, two of which were violent.[2]  In August 2005, Whyte was arrested for robbery in the second degree on two separate occasions.  In connection with those arrests, Whyte was convicted of robbery in the second degree and sentenced

---

[1]     The Government obtained Whyte's criminal history from a repository search of the New York State Division of Criminal Justice Services, dated October 20, 2020.  (See Gov't Opp'n at 2, ECF No. 29.)

[2]     Additionally, in January 2004, Whyte was arrested for felony grand larceny but ultimately pleaded guilty to a disorderly conduct charge.  (See Gov't Opp'n at 3, ECF No. 29.)  In February 2006, while incarcerated for felony robberies, Whyte was also arrested on felony prison contraband charges, and later pleaded guilty to a misdemeanor prison contraband charge.  (See id.)  In May 2010 too, Whyte was arrested on felony drug charges and later pleaded guilty to a misdemeanor drug charge in connection with that arrest. (See id.)

to 3.5 years' imprisonment.  In 2013, Whyte was arrested on felony assault and weapons charges, and later pleaded guilty to the felony weapons charge in August 2016.  On the felony weapons charge, Whyte was sentenced to a term of 3 to 6 years' imprisonment.[3]  In November 2014, while incarcerated on the felony weapons charge, Whyte was arrested for a felony prison contraband charge, an offense to which he ultimately pleaded guilty and received an indeterminate term of 2 to 4 years' imprisonment.

Prior to Whyte's felony weapons and felony prison contraband convictions, Whyte was not in custody.  While the two cases were pending, Whyte was arrested several more times.[4]  In December 2015, for example, Whyte was arrested for felony assault and weapons possession.  As a result of that arrest, Whyte was convicted of attempted assault in the second degree—a felony— and sentenced to 1.5 to 3 years' imprisonment.  While detained pending the outcome of the charges related to his 2013, 2014, and two 2015 arrests, Whyte was once again arrested on a felony prison contraband charge in March 2016.  Whyte ultimately pleaded guilty to the felony charge and received an indeterminate term of 2 to 4 years' imprisonment.  In 2019, Whyte completed his prison terms related to the panoply of felonies described above.[5]

In sum, Whyte has been convicted of five felonies to date and has been arrested several more times.  Thus, when arrested by the Hempstead Village Police Department ("HPD") on April 9, 2020, Whyte was someone who was well versed in the criminal justice system.

---

[3]     Whyte was later resentenced in that matter to an indeterminate term of 2 to 4 years' imprisonment. (See Gov't Opp'n at 3 n.3, ECF No. 29.)

[4]     Whyte was arrested in November of 2015 for misdemeanor assault and resisting arrest.  He ultimately pleaded guilty to resisting arrest.  (See Gov't Opp'n at 3, ECF No. 29.)

[5]     In November 2019, Whyte was arrested in Suffolk County for multiple misdemeanor charges. Those charges were pending at the time of the events related to Whyte's April 9, 2020, arrest.

### 2.     Whyte's Instant Criminal Conduct, Arrest, and Post-Arrest Statements

#### a.   The 911 Calls

At approximately 1:06 p.m. on April 9, 2020, HPD received a 911 call from a civilian requesting that police be sent to 12 Bernhard Street in Hempstead, New York ("12 Bernhard"). During the call, the civilian stated, "this shit is bananas" and asked "can you send an officer" before hanging up without providing additional information.  About two minutes later, at 1:08 p.m., HPD received a second 911 call from the same civilian.  On the second call, the civilian identified herself as Priscilla Alexandre (hereinafter, "Alexandre").  Alexandre stated, "there's a dispute going on," "my kids are inside," and the "guy who supposedly owns the house" had "a black gun."  Alexandre provided a description of the clothing the man with the gun was wearing, reported that she was "six months pregnant," and continued requesting police assistance at 12 Bernhard.  Following receipt of the 911 calls, HPD dispatched Police Officers Diana Reyes and Patrick Estelle to 12 Bernhard.

#### b.   Police Arrival at 12 Bernhard

At approximately 1:12 p.m., the officers arrived at 12 Bernhard and met with Alexandre in front of the residence.  Alexandre informed the officers that Whyte—whom she had rented her apartment from—had entered her apartment without her permission, damaged her teenage son's cellular phone, and pointed a gun at her and her child.  Officers Reyes and Estelle also observed Whyte moving within the residence from room to room and acting erratically.[6]

#### c.   Whyte's Arrest

While outside 12 Bernhard, the officers repeatedly requested that Whyte exit the residence,

---

[6]     Whyte contends that he was at 12 Bernhard on April 9, 2020, because he was "installing shades in some of the rooms."  (Def's Decl., Ex. A, ¶ 2, ECF No. 41.)  He also claims that the "homeowner had previously given him a key to" 12 Bernhard, that he "stayed some nights of the week at the house," and that he "had a lot of [his] belongings there, including a television, clothes, and furniture."  (Id.)  Further, Whyte claims that he received mail at the residence. (See id.)

but Whyte refused.  After several minutes, Whyte came to the front door, and the HPD officers again asked him to come outside.[7]  Whyte did not comply.  Based on the information Alexandre had reported on the 911 calls and outside 12 Bernhard, the officers attempted to place Whyte under arrest for menacing Alexandre with a firearm.  Whyte resisted arrest.  The officers, unaware if Whyte possessed a firearm at that point, attempted to subdue him by deploying a single taser shot before he could close the door.  Whyte was then placed under arrest at approximately 1:40 p.m.  The officers never saw Whyte with a firearm or any other weapon.

In keeping with standard practice when a taser is deployed during an arrest, Whyte was transported to Nassau University Medical Center Hospital ("NUMC"), where he was found to be fit for confinement.  (See Gov't Opp'n, Ex. A, ECF No. 29-1.)  Thereafter, NUMC discharged Whyte to the custody of HPD officers, who transported him to the HPD for arrest processing.

### d.  Search of 12 Bernhard

While Whyte was being taken to NUMC, members of law enforcement secured the scene at 12 Bernhard and simultaneously applied for a warrant to search the premises for the firearm Whyte reportedly pointed at Alexandre.[8]  At approximately 7:07 p.m., the Honorable Tammy S. Robbins, an Acting Nassau County Supreme Court Justice, authorized the search warrant for 12 Bernhard.  Law enforcement then conducted a search of 12 Bernhard and recovered a black Smith and Wesson 9mm pistol (the "Firearm") in a crawl space inside the residence.

---

[7]     At some point in time, Whyte opened the front door, but he did not come out or let the officers come in.  (See Def's Decl., Ex. A, ¶ 3, ECF No. 41.)

[8]     By this point in the investigation, HPD had contacted the Nassau County Police Department ("NCPD") Gang Investigations Squad ("GIS") to inform them about the arrest of Whyte.  (See Gov't Opp'n at 6 n.4, ECF No. 29.)  NCPD GIS detectives Wilson Marrero and Samuel Morales, who had been investigating a January 26, 2020, shooting incident involving Whyte, responded to 12 Bernhard.  (See id.)  Det. Marrero left the scene to apply to a Nassau County Court for a search warrant, and Det. Morales remained at the scene being secured by HPD.  (See id.)

### e.   Whyte Signs First Rights Card

While in custody at the HPD, at approximately 6:00 p.m., HPD detectives Anthony Cousins and Juan Miranda advised Whyte of his Miranda rights by reading them from a standard, pre-printed form used by the Nassau County police agencies.  (See Gov't Opp'n, Ex. B, ECF No. 29-2 ("First Rights Card").)  After being verbally advised of his Miranda rights, Whyte was given the First Rights Card to review and sign.  Whyte verbally, and in writing, indicated his understanding of his rights and his willingness to speak to law enforcement.  (See id.)

### f.   Whyte Signs Second Rights Card

Later that evening, at approximately 10:15 p.m.—after law enforcement had completed the search of 12 Bernhard and retrieved the Firearm—detectives from the Nassau County Police Department ("NCPD") Gang Investigations Squad ("GIS") reported to HPD to interview Whyte. Before the interview, Whyte was once again read Miranda warnings from a separate copy of the same pre-printed form ("Second Rights Card").  After verbally advising Whyte of his Miranda rights, the NCPD GIS detectives gave Whyte the Second Rights Card to review and sign.  Again, Whyte verbally and in writing indicated his understanding of his rights and his willingness to speak with law enforcement.  (See Gov't Opp'n, Ex. C, ECF No. 29-3.[9])   However, unlike when he reviewed the First Rights Card, Whyte was not willing to provide or sign a written statement.  (See Gov't Opp'n at 7, ECF No. 29.)

### g.   Whyte's Post-Arrest Statements

According to the Government, following Whyte's second agreement to waive his Miranda

---

[9]      In support of his motion to suppress his statements, Whyte submitted a signed declaration stating, "[o]n April 9, 2020, I do not remember the police telling me anything about Miranda and I don't remember signing anything about Miranda."  (Def's Decl., Ex. A, ¶ 5, ECF No. 41.)  He also asserts, "I know I was in a police precinct, but I don't know where.  I remember falling asleep at one point and not feeling well.  I remember they were trying to ask me questions."  (Id. at ¶ 4.)

rights, the NCPD GIS detectives questioned him about the events of April 9, 2020.  The NCPD GIS detectives also questioned Whyte about the events of a January 26, 2020, shooting they were investigating.[10]

During the ensuing conversation, Whyte made several statements about the incident on April 9, 2020.  Specifically, Whyte told the detectives that: (i) he rented rooms out at 12 Bernhard for a friend and was paid a piece of the rent; (ii) he got into an argument with a female tenant over overdue rent; (iii) the female tenant showed up with another male who acted aggressively towards him; and (iv) he told the female tenant, "I will shoot him if he comes near me."  (Gov't Opp'n at 7–8, ECF No. 29.)

When discussing the January 26, 2020, shooting, Whyte told the NCPD GIS detectives that: (i) on the day of the shooting, he got into an argument with an individual at a deli and put his hands on the individual outside in the parking lot; and (ii) he left the deli and shot at the car containing the individual.  (See Gov't Opp'n at 8, ECF No. 29.)

When the NCPD GIS detectives asked Whyte if the firearm recovered from 12 Bernhard was the same firearm that was used in the January 26, 2020, shooting, Whyte answered "yes."[11] Whyte also told the detectives that the Firearm was not loaded.

**B.** **Procedural History**

On July 27, 2021, a federal grand jury sitting in Central Islip, New York, returned an indictment charging Whyte with being a felon-in-possession of ammunition on January 26, 2020, in violation of 18 U.S.C. §§ 922(g)(1), 924(a)(2), and 3351 et seq. (Count One) and with being a

---

[10]     NCPD GIS had been investigating a shooting incident that occurred on January 26, 2020, where Whyte had allegedly shot at a car with an individual inside of the vehicle.  (See Gov't Opp'n at 7–8, ECF No. 29.)

[11]     Whyte's statement was confirmed by subsequent ballistics comparisons conducted on the firearm recovered from 12 Bernhard on April 9, 2020, and the shell casings located at the scene of the January 26, 2020, shooting.  (See Gov't Opp'n at 8 n.5, ECF No. 29.)

felon-in-possession of a firearm on April 9, 2020, also in violation of 18 U.S.C. §§ 922(g)(1), 924(a)(2), and 3351 et seq. (Count Two).  (See ECF No. 1.)  On August 30, 2021, Whyte was arraigned on the two-count indictment.  (See ECF No. 9.)

Thereafter, Whyte filed three motions currently pending before the Court.  On May 2, 2023, Whyte filed a motion to suppress statements made to law enforcement officers following his arrest on April 9, 2020.  (See Def.'s Mem., ECF No. 28.)  The Government filed its memorandum in opposition on May 12, 2023.  (See Gov't Opp'n, ECF No. 29.)  Whyte filed a reply on May 19, 2023.  (See Def.'s Reply, ECF No. 30.)  Whyte submitted a signed declaration in support of his motion on October 3, 2023.  (See Def's Decl., Ex. A, ECF No. 41.)

Also on October 3, 2023, Whyte filed, simultaneously, a second motion to suppress evidence and a motion to dismiss the indictment.  (See Def.'s Mem., ECF No. 40.)  The Government filed its memorandum in opposition on October 19, 2023.  (See Gov't Opp'n, ECF No. 42.)  Whyte filed a reply on November 17, 2023.  (See Def.'s Reply, ECF No. 43.)  Whyte did not submit a signed declaration in support of his motion to suppress the physical evidence and his motion to dismiss the indictment.

## II.    DISCUSSION

### A.    Motion to Suppress Statements

Whyte asks the Court to suppress his post-arrest statements made at the HPD on the basis that they were obtained in violation of the Fourth and Fifth Amendments.  Alternatively, he asks the Court to grant a hearing on the Fourth and Fifth Amendment issues raised.  The Government opposes Whyte's requests.  The Court addresses the parties' arguments according to the submissions provided.

### 1.   Fourth Amendment Claim

Whyte argues that his stationhouse statements are subject to exclusion as the "fruit" of a Fourth Amendment violation—that being: his warrantless arrest inside 12 Bernhard despite having a reasonable expectation of privacy in the residence.  (See Def.'s Mem. at 9, ECF No. 28 (citing Wong Sun v. United States, 371 U.S. 471, 484–85 (1963)).)  The Government argues that Whyte's Fourth Amendment claim is without merit because his arrest was supported by probable cause. The Court agrees with the Government.  For reasons that follow, the Court denies Whyte's motion to suppress his statements on Fourth Amendment grounds, without need for a hearing.

### a.   Applicable Law

The Fourth Amendment protects "'[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures' and prohibits the issuance of warrants without 'probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.'"  United States v. Jones, 43 F.4th 94, 108 (2d Cir. 2022) (quoting U.S. CONST. amend. IV).  "To safeguard Fourth Amendment rights generally, the Supreme Court has crafted the exclusionary rule, requiring the exclusion of evidence when the police exhibit deliberate, reckless, or grossly negligent disregard for Fourth Amendment rights."  United States v. Stokes, 733 F.3d 438, 443 (2d Cir. 2013) (internal citations and quotation marks omitted).

In Payton v. New York, the Supreme Court held that, in the absence of exigent circumstances, the Fourth Amendment prohibits police officers "from making a warrantless and nonconsensual entry into a suspect's home in order to make a routine felony arrest."  445 U.S. 573, 576 (1980); see also United States v. Allen, 813 F.3d 76, 77–78 (2d Cir. 2016).  However, ten years later in New York v. Harris, the Supreme Court stated that the "rule in Payton was designed to protect   the   physical   integrity   of   the   home;   it   was   not   intended   to   grant   criminal

suspects . . . protection for statements made outside their premises where the police have probable cause to arrest the suspect for committing a crime." 495 U.S. 14, 17 (1990). Thus, "[w]here the police have probable cause to arrest a suspect, the exclusionary rule does not bar the State's use of a statement made by the defendant outside of his home, even though the statement is taken after an arrest made in the home in violation of [the Fourth Amendment]." Id. at 14. Here, Whyte made his post-arrest statements inside the HPD stationhouse, not inside 12 Bernhard. Accordingly, New York v. Harris controls this case, so long as probable cause supported Whyte's arrest.[12] If New York v. Harris applies, Whyte's challenge to the admissibility of his post-arrest statements on Fourth Amendment grounds would be foreclosed.

It is well-settled that "a warrantless arrest is unreasonable under the Fourth Amendment unless the arresting officer has probable cause to believe a crime has been or is being committed." United States v. Delossantos, 536 F.3d 155, 158 (2d Cir. 2008) (citing Devenpeck v. Alford, 543 U.S. 146, 152 (2004)). "Probable cause exists if a law enforcement official, on the basis of the totality of the circumstances, has sufficient knowledge or reasonably trustworthy information to justify a person of reasonable caution in believing that an offense has been or is being committed by the person to be arrested." United States v. Steppello, 664 F.3d 359, 363–64 (2d Cir. 2011) (internal citation omitted). The Supreme Court has repeatedly stated that the probable cause standard is "a practical, nontechnical conception that deals with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." Maryland v. Pringle, 540 U.S. 366, 370 (2003) (internal quotations omitted). Thus, "[b]ecause the standard is fluid and contextual, a court must examine the totality of the circumstances of a given arrest." Delossantos, 536 F.3d at 159 (citing Pringle, 540 U.S. at 371)).

---

[12]    The Second Circuit has repeatedly upheld post-arrest stationhouse confessions under New York v. Harris despite a Payton violation. See, e.g., Mosby v. Senkowski, 470 F.3d 515, 521 (2d Cir. 2006); see also United States v. Price, 845 F. App'x 85, 86 (2d Cir. 2021).

**b. Discussion**

Here, the undisputed facts make clear that the officers had probable cause to believe Whyte committed a crime when they arrested him.  As explained above, Alexandre called 911 twice, each time requesting police officers be sent to 12 Bernhard.  During her first 911 call, Alexandre reported "this shit is bananas."  (Gov't Opp'n at 4, ECF No. 29.)  During her second 911 call, about two minutes later, she reported that "there's a dispute going on," "my kids are inside," and that the "guy that supposedly owns the house" had "a black gun."  (Id.)  Alexandre also provided a description of the clothing the man with the gun was wearing.  (See id. at 4–5.)  Additionally, upon arrival at 12 Bernhard, the HPD officers met Alexandre outside the residence, where she further reported that Whyte had entered her apartment without her permission, damaged her teenage son's cellular phone, and pointed a gun at her and her child.[13]  (See id. at 5.)  While outside 12 Bernhard, the officers were able to identify Whyte moving from room to room within the residence and acting erratically, based on Alexandre's description of his clothing.[14]  (See id.)  Considering the totality of these circumstances—specifically, Alexandre's reports to 911 and the HPD officers, coupled with the officers' own observations at 12 Bernhard—the officers undoubtedly had probable cause to arrest Whyte.  See Panetta v. Crowley, 460 F.3d 388, 395 (2d Cir. 2006) ("'[I]t is well-established that a law enforcement official has probable cause to arrest if he received his information from some person, normally the putative victim or eyewitness . . . .'" (quoting Martinez v. Simonetti, 202 F.3d 625, 634 (2d Cir. 2000))).  At the time the officers arrested Whyte, they had sufficient probable cause to believe that he committed several crimes, including weapons possession, menacing, and trespassing, among others.  (See Gov't Opp'n at 12, ECF No. 29.)

---

[13]    Critically, Whyte does not dispute this fact.

[14]    Whyte does not dispute this fact either.

Accordingly, the exclusionary rule does not require suppression of Whyte's post-arrest statements at the HPD because the officers arrested Whyte with probable cause.  See Mosby v. Senkowski, 470 F.3d 515, 521 (2d Cir. 2006) (citing Harris, 495 U.S. at 21)).  This is true regardless of any Payton violation that may have occurred during Whyte's warrantless arrest within 12 Bernhard.  Therefore, Whyte's Fourth Amendment claim is without merit.

### c.   Whyte Does Not Create a Factual Dispute to Warrant a Hearing

In the alternative to an order suppressing his post-arrest statements, Whyte requests the Court grant a hearing on the Fourth Amendment issues raised.  (See Def.'s Mem. at 9, ECF No. 28.)  "[A]n evidentiary hearing on a motion to suppress ordinarily is required if the moving papers are sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that contested issues of fact . . . are in question."  United States v. Watson, 404 F.3d 163, 167 (2d Cir. 2005) (internal quotation marks omitted).  "Moreover, if facts urged in support of a hearing would not entitle the moving party to relief as a matter of law, no evidentiary hearing is required."  Gentile v. Cty. of Suffolk, 926 F.2d 142, 148 (2d Cir. 1991) (internal citation omitted).  Ultimately, "the decision to grant an evidentiary hearing is committed to the court's discretion."  United States v. Hamilton, 487 F. Supp. 3d 140, 148 (E.D.N.Y. 2020).

Based on these standards and the information provided in Whyte's signed declaration, the Court concludes that Whyte has not alleged sufficiently definite disputed facts to necessitate a hearing on his Fourth Amendment claim.  As set forth above, any factual dispute about Whyte's reasonable expectation of privacy in 12 Bernhard is irrelevant because New York v. Harris controls this case.  Additionally, there are sufficient uncontested material facts in the papers supporting probable cause for Whyte's arrest to permit the Court to decide the Fourth Amendment issue without a hearing.  For example, Whyte does not dispute that—upon arrival at 12 Bernhard—the HPD officers met Alexandre outside the residence, where she reported that Whyte had entered her

12

apartment without her permission, damaged her teenage son's cellular phone, and pointed a gun at her and her child.  Whyte also does not dispute that—while outside 12 Bernhard—the officers identified him moving from room to room within the residence and acting erratically, based on Alexandre's description of his clothing.  It was the totality of these circumstances that provided the officers with probable cause to arrest Whyte, and critically Whyte does not dispute them—even under his account of the facts.  Accordingly, no evidentiary hearing is required on Whyte's Fourth Amendment claim.

### 2.      Fifth Amendment Claim

Whyte next argues his post-arrest statements must be suppressed because he did not knowingly, intelligently, or voluntarily waive his Fifth Amendment rights.  (See Def.'s Mem. at 5, ECF No. 28.)  The Government disagrees.  (See Gov't Opp'n at 4, ECF No. 29.)  For reasons that follow, the Court denies Whyte's motion to suppress his statements on Fifth Amendment grounds, without need for a hearing.

### a.   Applicable Law

The Court applies standards that are well-traveled.  In Miranda v. Arizona, the Supreme Court held that a "defendant may waive effectuation of" the rights conveyed in Miranda warnings "provided that waiver is made is made voluntarily, knowingly and intelligently."  384 U.S. 436, 444 (1966).  "The inquiry has two distinct dimensions."  Moran v. Burbine, 475 U.S. 412, 421 (1986).  First, "the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception."  Id. Second, "the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it."  Id.

Only if the "totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that

Miranda rights have been waived.  See id. (citing Fare v. Michael C, 442 U.S. 707, 725 (1979)).

These circumstances include "the accused's characteristics, the conditions of interrogation, and the

conduct of law enforcement officials."  United States v. Anderson, 929 F.2d 96, 99 (2d Cir. 1991);

see also United States v. Lynch, 92 F.3d 62, 65 (2d Cir. 1996) (applying the same totality of

circumstances analysis to determine "[w]hether a defendant knowingly and voluntarily waived his

rights").  Indeed, "the voluntariness of a waiver of [the Fifth Amendment] privilege has always

depended on the absence of police overreaching, not on 'free choice' in any broader sense of the

word."  Colorado v. Connelly, 479 U.S. 157, 170 (1986) (citing Moran, 475 U.S. at 421).

When a defendant contests his Miranda waiver, "the government bears the burden of

demonstrating by a preponderance of the evidence that a defendant waived his constitutional

rights."  Lynch, 92 F.3d at 65.  Though a defendant's signed waiver of his Miranda rights is "highly

probative" of voluntariness, United States v. Williams, 681 F.3d 35, 45 (2d Cir. 2012) (quoting

Oregon v. Elstad, 470 U.S. 298, 318 (1985)), it is "not inevitably either necessary or sufficient to

establish waiver."  North Carolina v. Butler, 441 U.S. 369, 373 (1979).

**b. Discussion**

In this case, there is no dispute that Whyte was in custody or that he was subject to

interrogation at the HPD.  The sole question is whether Whyte knowingly and voluntarily waived

his Miranda rights.  Whyte contends his waiver was involuntary because, at the HPD, (i) he does

not remember the police telling him anything about Miranda; (ii) he does not remember signing

anything about Miranda; (iii) he remembers not feeling well; and (iv) he remembers falling asleep

at one point.  (See Def's Decl., Ex. A, ¶¶ 4–5, ECF No. 41.)  In further support of his argument,

Whyte cites the "unusual and highly stressful circumstance[s]" of his interrogation—i.e., that he

had been "tased by police officers," that he "had to be taken to the hospital," and that he "was held

in the precinct for hours."  (Def.'s Mem. at 7, ECF No. 28.)  The Government argues that Whyte's

14

waiver was voluntary because he was advised of his Miranda rights at both 6:00 p.m. and 10:15 p.m. on April 9, 2020, and each time signed a rights card, indicating that he understood his rights. (See Gov't Opp'n, Exs. B–C, ECF No. 29.)  Based upon the facts alleged, the Court finds that the Government has sustained its burden of establishing that Whyte knowingly and voluntarily waived his Miranda rights.

Whyte's principal argument is that his Miranda waiver (if it occurred at all) could not have been the result of a "free and deliberate choice."  (Def.'s Mem. at 7, ECF No. 28 (citing Moran, 475 U.S. at 421).)  The Court disagrees.  As a preliminary matter, evidence of Whyte signing the First and Second Rights Cards after being advised of his Miranda rights is "highly probative" of a voluntary waiver in this case.  Williams, 681 F.3d at 45 (quoting Elstad, 470 U.S. at 318)).  In both instances—at 6:00 p.m. and again at 10:15 p.m.—Whyte applied his signature indicating he understood his rights, and Whyte does not dispute this evidence.  Instead, Whyte declares he does not remember being informed of his Miranda rights or signing a Miranda waiver. (See Def's Decl., Ex. A, ¶ 5, ECF No. 41.)  Such vague and conclusory allegations regarding the circumstances of his interrogation are—without any specific factual support—insufficient to create a factual dispute about the administration and waiver of his Miranda warnings.  See United States v. Jass, 331 F. App'x 850, 855 (2d Cir. 2009) (concluding evidentiary hearing not warranted where the defendant "did not allege that arresting officers failed to advise him of his Miranda rights; he claimed only that he could not 'remember' receiving a Miranda warning").  Further, evidence of Whyte signing both rights cards—without any allegations of "intimidation, coercion, or deception"—indicates that he was left with a "free and deliberate" choice of deciding whether to speak to the detectives.  Moran, 475 U.S. at 421.

The inquiry does not end there.  In considering Whyte's involuntary waiver claim, this Court must examine "the totality of all the surrounding circumstances, including the accused's

characteristics, the conditions of interrogation, and the conduct of law enforcement officials." Lynch, 92 F.3d at 65 (citing Anderson, 929 F.2d at 99)).

The first factor—Whyte's characteristics—does not cut clearly in favor of or against a finding of voluntariness.  On the one hand, Whyte was 33 years old at the time of his arrest—old enough to understand the meaning of a Miranda waiver.  See United States v. Gabriel, 2023 WL 2412178, at *8 (E.D.N.Y. Feb. 9, 2023) (finding that 35-year-old defendant was "certainly old enough to understand the meaning of the waivers"), report and recommendation adopted, 2023 WL 2403628 (E.D.N.Y. Mar. 8, 2023).  Additionally, there is no evidence that Whyte lacks maturity or intelligence.[15]  But on the other hand—although Whyte has an extensive criminal background, which suggests that he is familiar with criminal procedure and his rights—the Government provides no evidence that Whyte has previously received Miranda warnings.  See Anderson, 929 F.2d at 99 (stating that a defendant's extensive criminal history, including 12 arrests and 11 guilty pleas, did not support voluntariness because there was no evidence that the defendant had previously received Miranda warnings or that he had waived his Miranda rights).  But see United States v. Levy, 217 F. Supp. 3d 643, 669 (E.D.N.Y. 2016) (finding defendant's Miranda waiver valid because he had been arrested at least six times (resulting in several convictions), which indicated that "[h]e was familiar with criminal procedure and his rights" (citation omitted)).

Similarly, the second factor—the conditions of Whyte's interrogation at the HPD—does not clearly point either way.  Whyte's allegations regarding the "unusual and highly stressful circumstance[s]" of his interrogation—i.e., that he had been "tased by police officers," that he "had

---

[15]     Whyte's contention that he "has a General Equivalency Diploma" does not alter the Court's conclusion.  (Def.'s Mem. at 7, ECF No. 28.)  Whyte does not allege he is intellectually disadvantaged.  In any event, intellectual disadvantages do not, standing alone, make a Miranda waiver involuntary.  See United States v. Male Juvenile (95-CR-1074), 121 F.3d 34, 40–41 (2d Cir. 1997) (holding that intellectual disabilities alone are not enough to render Miranda waiver involuntary so long as defendant was aware "both of the nature of the right being abandoned and the consequences of the decision to abandon it").

to be taken to the hospital," and that he "was held in the precinct for hours"—are insufficient by themselves to establish an involuntary waiver.  (Def.'s Mem. at 7, ECF No. 28.)  Whyte provides no evidence that the conditions of the interrogation somehow prevented him from appreciating and understanding what he was being told (or what he had signed) at the HPD.  In any event, the Second Circuit has found waivers and statements to be voluntary despite more compelling circumstances of discomfort and disorientation than those Whyte alleges here.[16]   Similarly, Whyte's declaration that he was "not feeling well" and that he remembers "falling asleep at one point" in the HPD is also insufficient to warrant a finding that his waiver was involuntary.  (Def's Decl., Ex. A, ¶ 4, ECF No. 41.)  Whyte's vague allegation lacks supporting evidence on the effect, if any, that the interrogation conditions had on his ability to voluntarily waive his rights.

In this case, the third factor—law enforcement conduct—is determinative.  As mentioned, for a waiver to be voluntary, it must be "the product of a free and deliberate choice rather than intimidation, coercion, or deception."  Moran, 475 U.S. at 421.  Saddled with the burden of proving

---

[16]    See, e.g., In re Terrorist Bombings of U.S. Embassies in E. Afr., 552 F.3d 177, 211–12 (2d Cir. 2008) (holding that Miranda waiver was voluntary despite allegations that defendant was subject to "secret and relentless interrogation . . . over a ten-day period of incommunicado and solitary confinement in a Kenyan prison" because defendant signed Miranda waiver within hours of his arrest); Bastidas v. Henderson, 664 F. Supp. 51, 53–54 (E.D.N.Y. 1987) (waiver found voluntary even though defendant had been held at the police station for ten hours before Miranda warnings were given), aff'd, 842 F.2d 1287 (2d Cir. 1988); United States v. Siddiqui, 699 F.3d 690, 706–07 (2d Cir. 2012) (holding that un-Mirandized statements made as the defendant was recuperating from surgery to address a gunshot to her stomach and she was "tethered to her hospital bed in soft restraints" were voluntary); United States v. Khalil, 214 F.3d 111, 121–22 (2d Cir. 2000) (holding that statements made as the defendant was "being prepared for life-saving surgery" because of a gunshot wound to the leg and in response to questioning as the defendant "underwent several post-surgical procedures" were voluntary where evidence showed that although the defendant "was in pain, he was alert, seemed to understand the agent's questions, and gave responsive answers"); see also Pagan v. Keane, 984 F.2d 61, 63 (2d Cir. 1993) (holding, on habeas review, that statements made less than three hours after the defendant had been given morphine following emergency surgery for gunshot wounds, when he had a high fever, was required to wear an oxygen mask, and had at least five tubes or catheters connected to his body, were voluntary where the interrogating detective testified that the defendant, "though 'weakened,' . . . was 'very alert [and] able to answer all our questions with no problem'" (alteration in original)).  But see United States v. Taylor, 745 F.3d 15, 24 (2d Cir. 2014) (finding statement involuntary where suspect had ingested a large quantity of Xanax before interrogation, fell asleep multiple times throughout the interview, and officers acknowledged having to wake him up and "refocus" him—at one point coaxing him, "Mr. Taylor, you have to answer our questions and focus with us").

that Whyte's waiver was voluntary, see Lynch, 92 F.3d at 65, the Government's allegations regarding the detectives' conduct during Whyte's interrogation show no sign of any such "intimidation, coercion, or deception.'" United States v. Male Juvenile (95-CR-1074), 121 F.3d 34, 42 (2d Cir. 1997) (quoting Moran, 475 U.S. at 421)). Crucially, Whyte's papers are also devoid of any allegation whatsoever that the detectives resorted to coercive, threatening, or intimidating tactics to elicit his Miranda waiver. Accordingly, the Court finds nothing about the detectives' conduct during Whyte's interrogation that warrants a finding that Whyte involuntarily waived his Miranda rights.

In sum, having considered the totality of the circumstances, the Court finds that the Government has proved by a preponderance of the evidence that Whyte knowingly and voluntarily waived his Miranda rights. Thus, the Court denies Whyte's motion to suppress his post-arrest statements on Fifth Amendment grounds.

### c.   Whyte Does Not Create a Factual Dispute to Warrant a Hearing

In the alternative to an order suppressing his post-arrest statements, Whyte requests the Court grant a hearing on the Fifth Amendment issues raised. (See Def.'s Reply Mem. at 3, ECF No. 30.)

As mentioned, an evidentiary hearing on a motion to suppress need not be granted as a matter of course and must be held only "if the moving papers are sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that contested issues of fact . . . are in question." In re Terrorist Bombings of U.S. Embassies in E. Afr., 552 F.3d 157, 165 (2d Cir. 2008) (citing Watson, 404 F.3d at 167)). For example, the Second Circuit has stated that "[a]n assertion that Miranda warnings were not given, when the government asserts the contrary, . . . creates a specific factual dispute [that] cannot properly be resolved without an evidentiary hearing." United States v. Mathurin, 148 F.3d 68, 69 (2d Cir. 1998). However, where assertions in an affidavit,

18

"even if assumed to be true, would not require suppression," a court may properly "declin[e] to hold an evidentiary hearing." United States v. Getto, 729 F.3d 221, 226 n.6 (2d Cir. 2013). For the following reasons, the Court declines Whyte's request for an evidentiary hearing.

First, Whyte's case is unlike United States v. Mathurin, 148 F.3d 68, 69 (2d Cir. 1998). Whyte does not squarely attest that he was not—in fact—given Miranda warnings. Instead, Whyte makes vague statements in his declaration that he "do[es] not remember the police telling [him] anything about Miranda" and that he does not "remember signing anything about Miranda." (Def's Decl., Ex. A, ¶ 5, ECF No. 41.) That one sentence in Whyte's declaration is not "sufficiently specific, detailed, or nonconjectural to enable the court to conclude that contested issues of fact . . . are in question."[17] In re Terrorist Bombings of U.S. Embassies in E. Afr., 552 F.3d at 165; see also Jass, 331 F. App'x at 855 (holding defendant was not entitled to a hearing because he "did not allege that arresting officers failed to advise him of his Miranda rights; he claimed only that he could not 'remember' receiving a Miranda warning"). Accordingly, on this declaration, Whyte does not raise a contested issue of fact requiring an evidentiary hearing.

Second, even crediting Whyte's version of the events, he fails to allege facts which would compel suppression of the post-arrest statements. For starters, Whyte's declaration that he was "not feeling well" and that he remembers "falling asleep at one point" in the precinct—even if true—"would not require suppression" as a matter of law. Getto, 729 F.3d at 226 n.6; (Def's Decl., Ex. A, ¶ 4, ECF No. 41.) The same is true for Whyte's allegations regarding the "unusual and highly stressful" circumstances of his interrogation—i.e., that he had been "tased by police officers," that he "had to be taken to the hospital," and that he "was held in the precinct for hours." (Def.'s Mem. at 7, ECF No. 28.) As indicated, the Second Circuit has found waivers and

---

[17]     The First and Second Rights Cards signed by Whyte at the HPD, however, demonstrated that Whyte had in fact been informed of and waived his Miranda rights. (See Gov't Opp'n, Exs. B–C, ECF No. 29.)

statements to be voluntary despite more compelling circumstances of discomfort and disorientation than those Whyte alleges here.  See supra at 17 n.16.  And crucially, Whyte does not allege that the detectives coerced, threatened, or intimidated him to elicit his Miranda waiver.  Thus, even crediting Whyte's version of the events, the Court finds that the Government has sustained its burden of establishing that Whyte waived his Miranda rights.  See Lynch, 92 F.3d at 65.  Accordingly, Whyte's allegations, "even if assumed to be true, would not require suppression," and this Court may properly "declin[e] to hold an evidentiary hearing."  Getto, 729 F.3d at 226 n.6

Whyte's request for an evidentiary hearing on the Fifth Amendment issues raised is therefore denied.

**B.    Motion to Suppress Evidence**

Whyte also asks the Court to suppress the Firearm on the basis that law enforcement—in violation of the Fourth Amendment—searched 12 Bernhard and found evidence prior to the issuance of the search warrant.  The Government opposes Whyte's Fourth Amendment claim.  For reasons that follow, the Court denies Whyte's motion seeking suppression of the physical evidence, without the need for a hearing.

**1.  Applicable Law**

It is indeed a "basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable."  Brigham City, Utah v. Stuart, 547 U.S. 398, 403 (2006) (internal quotations omitted).  Here, the parties dispute (i) whether Whyte has a reasonable expectation of privacy in 12 Bernhard, compare Def.'s Mem. at 7, ECF No. 40, with Gov't Opp'n at 3, ECF No. 42; and (ii) whether law enforcement searched the residence and found the Firearm prior to the issuance of the search warrant, in violation of the Fourth

Amendment.[18]  (See Def.'s Mem. at ¶ 7, ECF No. 40.)  Even assuming arguendo that an unconstitutional warrantless search did occur in this case, the Court denies Whyte's suppression motion because the independent source doctrine applies.

The independent source doctrine "allows trial courts to admit evidence obtained in an unlawful search if officers independently acquired it from a separate, independent source."  Utah v. Strieff, 579 U.S. 232, 238 (2016) (citing Murray v. United States, 487 U.S. 533, 537 (1988)).  The doctrine applies in cases where: "(1) the warrant [was] supported by probable cause derived from sources independent of the illegal entry; and (2) the decision to seek the warrant [was not] prompted by information gleaned from the illegal conduct."  United States v. Johnson, 994 F.2d 980, 987 (2d Cir. 1993) (citing Murray, 487 U.S. at 542 (1988)).  When considering the second Murray prong, the "relevant question is whether the warrant 'would have been sought even if what actually happened had not occurred.'"  Id. (citing Murray, 487 U.S. at 542 n.3).  Thus, even assuming the search of 12 Bernhard was constitutionally improper, suppression is not warranted if (1) the search warrant was supported by probable cause from sources independent of the search, and (2) the decision to seek the warrant was not prompted by information acquired during the search.

### 2.  Discussion

In this case, the first element of Murray is easily satisfied.  The Government's Affidavit in Support of the Search Warrant (hereinafter, the "Affidavit") contained ample information from independent, untainted sources to establish probable cause to search 12 Bernhard for the Firearm.

---

[18]     The Government argues that Whyte does not provide any supporting factual allegations for his claim that law enforcement searched the residence and found the Firearm prior to the issuance of the search warrant.  (See Gov't Opp'n at 3, ECF No. 42.)  The Court agrees.  In response, Whyte argues that—in the motion context—it is sufficient that his counsel signed and filed a declaration affirming under penalties of perjury that police officers searched 12 Bernhard Street and found the Firearm hours before Det. Marrero applied for and received the warrant to search the residence.  (See Def's Rep. Mem. at 1, ECF No. 43.)  Although the Court disagrees, it need not address Whyte's argument further because the independent source doctrine permits admission of the Firearm.

See Illinois v. Gates, 462 U.S. 213, 238 (1983) (explaining that probable cause exists when, "given all the circumstances set forth in the affidavit . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place").  The Affidavit, to start, explains that NCPD GIS Det. Marrero was informed that Whyte—during a dispute with Alexandre—"pulled out what appeared to be a black handgun," causing her "to fear for her life."  (Def.'s Mem., Ex. A at 7–8, ECF No. 40-1.)  Thereafter, Whyte "went back into [12 Bernhard]," "did not leave [] prior to the police arriving," and was then "placed under arrest."  (Id. at 8.)  Crucially, nothing in the Affidavit references the contents or the interior of 12 Bernhard.  (See id. at 7–9.)  Det. Marrero readily disclosed to Judge Robbins that members of the HPD had secured the premises and ensured that "no one was present inside [12 Bernhard] after [Whyte] was arrested."  (Id. at 8.)  Further, no information related to what the HPD officers may or may not have seen inside the premises was included in the Affidavit.  (See id. at 7–9.)  Accordingly, probable cause for the issuance of the warrant was derived from sources other than observations made from within 12 Bernhard.  Based on those independent and untainted sources, the Court concludes that the Affidavit included information sufficient to establish probable cause to search 12 Bernhard for the Firearm.  See Gates, 462 U.S. at 238.

The second Murray element, while more complex, is also satisfied.  On this element, the relevant question is whether the warrant "would have been sought even if what actually happened had not occurred." Murray, 487 U.S. at 542 n.3.  In other words, the Court must consider whether Det. Marrero would have applied for a warrant had the purportedly unlawful search of 12 Bernhard not occurred.  Clearly, Det. Marrero could have and would have applied for the search warrant regardless of the search.  As mentioned, "there was probable cause for the warrant to issue." Johnson, 994 F.2d at 987.  Further, the nature of the allegations communicated to Det. Marrero— i.e., that Whyte menaced a civilian with a firearm in 12 Bernhard—coupled with the fact that

22

Whyte was arrested without a weapon on his person, would have necessitated law enforcement to seek a search warrant.  (Def.'s Mem., Ex. A at 7–9, ECF No. 40-1.)  Thus, the Court concludes that the warrant "would have been sought even if [the search of 12 Bernhard] had not occurred." Murray, 487 U.S. at 542 n.3.

When "admitting evidence under the independent source exception, courts must be careful to ensure that the government does not gain an advantage from its initial violation." Johnson, 994 F.2d at 987.  Here, the Government would have acquired the Firearm without the purportedly unlawful search.  As mentioned, the warrant application was prompted not by the search but by sources other than observations made from within 12 Bernhard.  (See Def.'s Mem., Ex. A at 7–8, ECF No. 40-1.)  Even assuming arguendo that an unlawful search occurred, "[w]hat is key is the fact that the[] error did not result in the government obtaining evidence it would not otherwise have obtained." Johnson, 994 F.2d at 987.  Thus, the search of 12 Bernhard should not operate to suppress the Firearm when the search was not a factor in applying for or receiving the warrant.

Accordingly, suppression of the Firearm is not required because the search warrant obtained by law enforcement was supported by independent sources, and the search itself did not prompt NCPD GIS Det. Marrero's warrant application.  The Court therefore denies Whyte's motion to dismiss the physical evidence.

## C.    Motion to Dismiss the Indictment

The Court concludes with Whyte's constitutional challenge to the indictment.  Specifically, Whyte argues that 18 U.S.C. § 922(g)(1) is unconstitutional under the Second Amendment as applied to him.  For the reasons explained below, Whyte's as-applied challenge fails.  Accordingly, the Court denies Whyte's motion to dismiss the indictment.

### 1.  Applicable Law

The Second Amendment to the Constitution of the United States provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."  U.S. CONST. amend. II.  The Supreme Court held in District of Columbia v. Heller, 554 U.S. 570 (2008) and McDonald v. Chicago, 561 U.S. 742 (2010) (plurality) that "the Second and Fourteenth Amendments protect the right of an ordinary, law-abiding citizen to possess a handgun in the home for self-defense," and held later in New York State Rifle & Pistol Association, Inc. v. Bruen that this protection includes the "right to carry a handgun for self-defense outside the home."  142 S. Ct. at 2122.  As set forth in Bruen, the standard for applying the Second Amendment is as follows: "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation."[19]  142 S. Ct. at 2129–30.

But, as the Supreme Court has made clear repeatedly, the Second Amendment right is "not unlimited."  Heller, 554 U.S. at 595; see also McDonald, 561 U.S. at 786 ("[T]he right to keep and bear arms is not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." (internal quotation marks and citation omitted)).  Throughout its modern Second Amendment jurisprudence, the Supreme Court has consistently limited its recognition of

---

[19]     In this way, Bruen supplanted "a 'two-step' framework for analyzing Second Amendment challenges that combines history with means-end scrutiny" around which the Courts of Appeals, including the Second Circuit, previously "coalesced."  142 S. Ct. at 2125.  Under that framework, courts would first "determine whether the challenged legislation impinges upon conduct protected by the Second Amendment," and if so, courts would then determine "the appropriate level of scrutiny to apply and evaluate the constitutionality of the law using that level of scrutiny."  United States v. Jimenez, 895 F.3d 228, 232 (2d Cir. 2018).  Bruen's new framework essentially removes the second step—the means-ends balancing—from the inquiry.  See Bruen, 142 S. Ct. at 2127 ("Despite the popularity of this two-step approach, it is one step too many.").  "The Bruen test," therefore, "turns on textual and historical analysis alone."  United States v. Rowson, 652 F. Supp. 3d 436, 454 (S.D.N.Y. 2023).

Second Amendment rights to "law-abiding citizens" and has noted its approval for felon-in-possession laws.  In <u>Heller</u>, for example, the Supreme Court struck down the District of Columbia's "ban on handgun possession in the home" and "its prohibition against rendering any lawful firearm in the home operable for the purpose of immediate self-defense."  554 U.S. at 635.  In doing so, the Court recognized the core of the Second Amendment as "the right of <u>law-abiding</u>, responsible citizens to use arms in defense of hearth and home."  <u>Id.</u> (emphasis added).  The <u>Heller</u> Court made clear that "the right secured by the Second Amendment is not unlimited" and that "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons."  <u>Id.</u> at 626; <u>see also id.</u> at 626–27 n.26 (characterizing the felon-in-possession law as a "presumptively lawful regulatory measure[ ]").

Two years later, in <u>McDonald</u>, the Court reaffirmed <u>Heller</u>, holding that the Second Amendment right to possess handguns in the home for the purpose of self-defense is "fundamental to our scheme of ordered liberty" and "deeply rooted in this Nation's history and tradition." 561 U.S. at 767–68 (internal quotation marks and emphasis omitted).  As such, a plurality of the Court held that the Due Process Clause of the Fourteenth Amendment incorporates the Second Amendment right against state and local governments.  <u>See id.</u> at 791.  The plurality "repeat[ed] <u>Heller</u>'s] assurances" that "our holding d[oes] not cast doubt on such longstanding regulatory measures as prohibitions on the possession of firearms by felons."[20]  <u>Id.</u> at 786 (internal quotation marks omitted).

---

[20]     Justice Thomas declined to join the plurality due to a disagreement as to the basis for Fourteenth Amendment incorporation.  <u>See</u> <u>McDonald</u>, 561 U.S. at 805–06 (Thomas, J., concurring) ("I agree with the Court that the Fourteenth Amendment makes the right to keep and bear arms set forth in in the Second Amendment 'fully applicable to the States.' ... But I cannot agree that it is enforceable against the States through a Clause that speaks only to 'process.'  Instead, the right to keep and bear arms is a privilege of American citizenship that applies to the States through the Fourteenth Amendment's Privileges or Immunities Clause.").

In <u>Bruen</u>, the Supreme Court repeatedly reaffirmed the holdings of <u>Heller</u> and <u>McDonald</u>. See <u>Bruen</u>, 142 S. Ct. at 2122 (describing its holding as "consistent with <u>Heller</u> and <u>McDonald</u>"); <u>id.</u> at 2126 ("In keeping with <u>Heller</u>, we hold that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct."); <u>id.</u> at 2127 (declining to adopt the Courts of Appeals' "two-step approach" because while "[s]tep one of the predominant framework is broadly consistent with <u>Heller</u>," "<u>Heller</u> and <u>McDonald</u> do not support applying means-ends scrutiny"); <u>id.</u> at 2131 (characterizing the standard "appl[ied] today" as "the test we set forth in <u>Heller</u>"); <u>id.</u> at 2131–32 ("Following the course charted by <u>Heller</u>, we will consider whether 'historical precedent' from before, during, and even after the founding evinces a comparable tradition of regulation." (quoting <u>Heller</u>, 554 U.S. at 631)); <u>id.</u> at 2134 ("Having made the constitutional standard endorsed in <u>Heller</u> more explicit, we now apply that standard to New York's proper-cause requirement."); <u>id.</u> at 2138 ("Under <u>Heller</u>'s text-and-history standard, the proper-cause requirement is therefore unconstitutional.").

Moreover, while the Court in <u>Bruen</u> recognized "an individual's right to carry a handgun for self-defense outside the home," 142 S. Ct. at 2122, it consistently characterized the holders of the right as "law-abiding" citizens.   See <u>id.</u> ("recogniz[ing] that the Second and Fourteenth Amendments protect the right of an ordinary, law-abiding citizen to possess a handgun in the home for self-defense" and "agree[ing]" with both parties that "ordinary, law-abiding citizens have a similar right to carry handguns publicly for their self-defense"); <u>id.</u> at 2124–25 (describing the petitioners as "law-abiding, adult citizens"); <u>id.</u> at 2131 (describing the Second Amendment as "the very product of an interest balancing by the people" which "surely elevates above all other interests the right of law-abiding, responsible citizens to use arms" (internal quotation marks and emphasis omitted)); <u>id.</u> at 2133 (directing courts to consider, among other things, "how and why the regulations burden a law-abiding citizen's right to armed self-defense"); <u>id.</u> at 2134 ("It is

undisputed that petitioners Koch and Nash—two ordinary, law-abiding, adult citizens—are part of 'the people' whom the Second Amendment protects."); id. at 2138 (noting that there is no "historical tradition limiting public carry only to those law-abiding citizens who demonstrate a special need"); id. at 2156 (similar, and concluding that "New York's proper-cause requirement violates the Fourteenth Amendment in that it prevents law-abiding citizens with ordinary self-defense needs from exercising their right to keep and bear arms").

Finally, while Bruen's majority opinion did not include an explicit endorsement of felon-in-possession laws as in Heller and McDonald, it did acknowledge that the right to keep and bear arms is "subject to certain reasonable, well-defined restrictions."  142 S. Ct. at 2156.  In addition, six of the nine Justices authored or joined separate opinions which, among other things, noted that Bruen does not disrupt or abrogate Heller and McDonald's endorsements of felon-in-possession laws.  Justice Alito, for example, "reiterate[d]" that "[a]ll that we decide in this case is that the Second Amendment protects the right of law-abiding people to carry a gun outside the home for self-defense and that the Sullivan Law . . . is unconstitutional," but that the Court's holding does not "disturb[ ] anything that we said in Heller or McDonald . . . about restrictions that may be imposed on the possession or carrying of guns."  Id. at 2157, 2159 (Alito, J., concurring).  Similarly, in a concurring opinion joined by Chief Justice Roberts, Justice Kavanaugh noted that when "[p]roperly interpreted, the Second Amendment allows a 'variety' of gun regulations," including limitations on the possession of firearms by felons.  Id. at 2162 (Kavanaugh, J., concurring) (quoting Heller, 554 U.S. at 636).  The three dissenting Justices also noted that they "underst[ood] the Court's opinion [] to cast no doubt on th[e] aspect of Heller's holding" that felon-in-possession laws are "presumptively lawful."  Id. at 2189 (Breyer, J., joined by Sotomayor and Kagan, JJ., dissenting).

While it may be true that this Supreme Court authority constitutes dicta, this Court cannot cavalierly disregard it.   See United States v. Bell, 524 F.2d 202, 206 (2d Cir. 1975) ("While . . . dictum is not binding upon us, it must be given considerable weight and can not [sic] be ignored in the resolution of the close question we have to decide." (footnote omitted)).   More importantly, the Second Circuit has turned this "dicta" from Heller and McDonald into binding precedent.  Following those cases, the Second Circuit held in United States v. Bogle that Section "922(g)(1) is a constitutional restriction on the Second Amendment rights of convicted felons." 717 F.3d at 281–82 (2d Cir. 2013).  In doing so, the Second Circuit rejected a defendant's argument that § 922(g)(1) violated his Second Amendment rights under "recent Supreme Court opinions [i.e., Heller and McDonald] developing a more expansive interpretation of the Amendment," because "in both of th[o]se opinions, the Supreme Court clearly emphasized that recent developments in Second Amendment jurisprudence should not 'be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons.'" Id. at 281 (quoting Heller, 554 U.S. at 626).

The Second Circuit's decision in Bogle is still good law because the Bogle Court did not utilize the means-ends interest balancing that the Supreme Court rejected in Bruen.  Rather, the Second Circuit reasoned purely from language in Heller and McDonald expressly affirming "longstanding prohibitions on the possession of firearms by felons."  Bogle, 717 F.3d at 281 (internal quotation marks omitted).  With Heller and McDonald still in full force after Bruen, Bogle remains binding precedent within this Circuit on the constitutionality of § 922(g).  See United States v. Peguero, 34 F.4th 143, 158 (2d Cir. 2022) ("It is a longstanding rule that a panel of our Court is bound by the decisions of prior panels until such times as they are overruled either by an en banc panel of our Court or by the Supreme Court." (internal quotation marks omitted)).  That is also the conclusion of numerous other judges within this Circuit.  See United States v. Garlick,

2023 WL 2575664, at *5 (S.D.N.Y. Mar. 20, 2023) ("Bruen does not alter the holding of Bogle: Section 922(g) is a constitutional regulation of the possession of firearms.  There is nothing in Bruen that suggests the Court saw that explication of the reach of the Second Amendment as disturbing the Supreme Court's dicta that 'longstanding prohibitions on the possession of firearms by felons' remain constitutional."); United States v. Barnes, 2023 WL 2268129, at *2 (S.D.N.Y. Feb. 28, 2023) ("Because Bruen did not disturb either of those two precedents [i.e., Heller and McDonald], the Second Circuit's holding in Bogle continues to govern this issue."); United States v. Craft, 2023 WL 6215326, at *3 (S.D.N.Y. Sept. 25, 2023) (asserting that "Bogle remains controlling precedent in this Circuit" and rejecting the defendant's facial and as-applied challenges to § 922 (g)(1)); United States v. Alston, 2023 WL 6977055, at *3 (E.D.N.Y. Oct. 23, 2023) ("Bogle remains binding precedent in this circuit, and defendant's constitutional challenge to § 922(g)(1) fails as a consequence.") (internal footnote omitted); United States v. Davila, 2023 WL 5361799, at *2 (S.D.N.Y. Aug. 22, 2023) (restating Bogle's holding that § 922(g)(1) is "a constitutional restriction on the Second Amendment rights of convicted felons" and denying the defendant's argument that § 922(g)(1) is unconstitutional facially and as applied to him); United States v. Hampton, 2023 WL 3934546, at *13 (S.D.N.Y. June 9, 2023) (rejecting a facial challenge to the constitutionality of § 922(g)(1) after concluding that Bogle is controlling precedent in this Circuit, even after Bruen); United States v. King, 634 F. Supp. 3d 76, 83 (S.D.N.Y. 2022) (rejecting both facial and as-applied challenges to the constitutionality of Section 922(g)(1)).

In sum, this Court cannot disregard the Second Circuit's binding precedent in Bogle that § 922(g)(1) is a constitutional restriction on the Second Amendment rights of convicted felons. The Second Circuit has not said that Bruen disturbed Bogle, so this Court is obligated to follow it.

2.      **Discussion**

Whyte argues that § 922(g)(1) is unconstitutional as applied to him because the conduct forming the basis of his prior felony convictions—robbery, attempted assault, possession of prison contraband (twice), and criminal possession of a weapon—would not have authorized a lifetime ban on firearm possession in 1791.  (See Def.'s Mem. at 2, ECF No. 40.)  The Court disagrees. There is nothing in Heller, McDonald, or Bogle to suggest that the validity of a restriction on a felon in possession turns on the nature of the felony that triggers the restriction.  Section 922(g)(1) makes it unlawful for any person "who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year . . . to . . . possess in or affecting commerce, any firearm . . . ."  For each of Whyte's prior felony convictions, the New York State Legislature determined that the crimes were sufficiently serious to warrant a possible punishment of a term "exceeding one year."  18 U.S.C. § 922(g)(1).  Thus, Whyte's prior felony convictions fall squarely within § 922(g)(1).

Whyte's efforts to sustain an as-applied challenge based on his previous felony convictions are unavailing.  He principally relies on Range v. Attorney General, 69 F.4th 96 (3d Cir. 2023) (en banc), which found that § 922(g)(1) was unconstitutional as applied to an individual with a prior nonviolent felony.  But Range is neither persuasive nor controlling, and in any event is inconsistent with Bogle and the numerous other cases in this Circuit that have continued to follow Bogle after Bruen.  See, e.g., Craft, 2023 WL 6215326, at *4 (rejecting defendant's facial and as-applied challenges to Section 922(g)(1) after finding Range unpersuasive and not controlling); United States v. Nelson, 2023 WL 6520378, at *3 (S.D.N.Y. Oct. 4, 2023) (same); Davila, 2023 WL 5361799, at *5 n.7 (same); United States v. Sternquist, 2023 WL 6066076, at *6 (E.D.N.Y. Sept. 15, 2023) (same); United States v. Warren, 2023 WL 5978029, at *6 (E.D.N.Y. Sept. 14, 2023) (same); United States v. Harrison, 2023 WL 4670957, at **7–8 (N.D.N.Y. Jul. 20, 2023) (same);

see also United States v. Jackson, 69 F.4th 495, 502, 505–06 (8th Cir. 2023) (rejecting a post-Bruen as-applied challenge to the constitutionality of § 922(g)(1) after finding "that there is no need for felony-by-felony litigation regarding the constitutionality of § 922(g)(1)").  Regardless, Whyte's case is factually distinguishable from Range given that Whyte's prior felony convictions include two serious, violent felonies (and five felonies in total), whereas Range involved a food stamp fraudster who pleaded guilty to a state law misdemeanor.[21]  The Court therefore rejects Whyte's argument that it should follow Range in this case.

Accordingly, Whyte's as-applied challenge to § 922(g)(1) fails, and his motion to dismiss the indictment is denied.

### III.    CONCLUSION

For the reasons stated above, Whyte's motions are DENIED in their entirety, without need for a hearing.

**SO ORDERED.**

Dated:   November 21, 2023
         Central Islip, New York

_____
/s/ JMA
JOAN M. AZRACK
UNITED STATES DISTRICT JUDGE

---

[21]    Although the defendant in Range's conviction for food stamp fraud was classified as a misdemeanor under Pennsylvania state law, it still qualified as felony-equivalent conduct under § 922(g)(1) because it was punishable by up to 5 years' imprisonment.  See Range, 69 F.4th at 98.